UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

RAYMOND THOMAS,

                               Plaintiff,

      -against-

CIGNA GROUP INSURANCE, *et al.*,

                             Defendants.

-----------------------------------------------------------x

**MEMORANDUM AND ORDER**

09-CV-5029 (SLT) (RML)

**TOWNES, United States District Judge:**

      In 2009, plaintiff Raymond Thomas commenced this action under the Employment Retirement Income Security Act, 29 U.S.C. §1001 *et seq.*, seeking to recover life insurance benefits allegedly owed to him by the Countrywide Financial Corporation Group Insurance Plan, an employee benefit plan administered by Life Insurance Company of North America ("LINA"), following the death of his sister, Judith Thomas ("Ms. Thomas" or "Decedent"). In 2011, plaintiff; defendant Bank of America Corporation (the "Bank"), of which Countrywide is now a wholly owned subsidiary; and defendant CIGNA Group Insurance ("Cigna") and its subsidiary, LINA (collectively, the "Insurers") moved for summary judgment. In a memorandum and order dated January 4, 2013 (the "Prior M&O"), this Court denied the defendants' summary judgment motions except to the extent that they asserted that plaintiff's Second Amended Complaint did not allege any viable claims other than the claim pursuant to 29 U.S.C. §1132(a)(1)(B). The Court granted plaintiff's motion to the extent of remanding the matter for further factfinding and a new eligibility determination. Specifically, the Court directed that LINA investigate whether Countrywide "furnished the SPD ... in accordance with the relevant regulations" and whether the SPD placed participants in the Basic Life Insurance Plan on notice of certain "Waiver of Premium" provisions. Prior M&O, p. 44.

On May 9, 2013, after conducting its investigation, LINA determined that the Decedent was "appropriately informed of her Waiver of Premium rights" under the life insurance plans, but "failed to timely exercise those rights within the allowable timeframes." LINA 602. LINA further determined that "no coverage was in-force under the group policy insuring the plan at the time of her death and that no benefits are ... payable ...." *Id.* In the wake of this decision, the Insurers and plaintiff again cross-move for summary judgment. For the reasons set forth below, the Insurers' motion for summary judgment is denied and plaintiff's motion is granted to the extent of remanding this matter to LINA for further proceedings consistent with this memorandum and order.

## *BACKGROUND*

Although this memorandum and order assumes familiarity with the Prior M&O, the Court will re-state the salient facts for the convenience of the reader. These facts are either undisputed, as reflected by the Insurer's Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 (the "56.1 Statement") and plaintiff's response thereto (the "56.1 Response"), or drawn from the Administrative Record.

In mid-May 2002, Decedent began working for Countrywide as a "Home Loan Consultant - External." LINA 534. As an active employee, she automatically received various benefits, including Basic Life Insurance. LINA 1357. However, she also opted to enroll in Countrywide's Voluntary Life Insurance Plan, which required her to pay "contributions" to cover the premiums. LINA 1359. Decedent was covered under both insurance plans as of August 1, 2002. LINA 403.

In October 2004, Decedent stopped working, alleging that she was disabled. 56.1 Statement ¶ 15; 56.1 Response ¶ 15. Decedent never returned to work, LINA 403, and passed away on May 24, 2008. 56.1 Statement ¶ 17; 56.1 Response ¶ 17. Prior to her death, Decedent had named her brother, plaintiff Raymond Thomas, as the beneficiary under both policies. 56.1 Statement ¶ 14; 56.1 Response ¶ 14.

At the time Decedent allegedly became disabled, Countrywide's Basic Life Insurance Plan and Voluntary Life Insurance Plan were underwritten by LINA pursuant to two group insurance policies—FLX-980007 and FLX 980008 (the "Policies"). 56.1 Statement ¶¶ 1,2; 56.1 Response ¶¶ 1,2. Both Policies had been issued by LINA to policyholder Trustee of the National Consumer Insurance Trust. *Id.* Countrywide became a subscriber to the Policies effective January 1, 2003. *Id.*; LINA 28, 60.

Although FLX-980007 provided benefits under the Voluntary Life Insurance Plan, LINA 31, and FLX-980008 provided benefits under the Basic Life Insurance Plan, LINA 63, both Policies contained many of the same provisions. Both provided that an insured employee's coverage ends when the employee is "no longer in Active Service," unless it has already ended for one of several other, listed reasons. LINA 40, 67.[1] However, the Policies also provided that employees who were no longer in Active Service could remain "eligible to continue insurance" under certain circumstances. LINA 40, 68. These "continuation options" were characterized in

---

[1] Both polices provided identical definitions of the term "Active Service," stating that an employee would be considered in Active Service on any scheduled work day in which the employee was either "actively at work" or out on "a scheduled holiday, vacation day or period of Employer approved paid leave of absence." LINA 52, 78.

the Policies as "benefits" and described in the "Schedule of Benefits" set forth at the start of each

policy. LINA 31-32, 63-64.

One of the continuation options available to all active, full-time employees was "Waiver

of Premium." *Id.* Both policies described this option in the exact same terms:

> If an Employee is under age 60 and his or her Active Service ends
> due to Disability, Life Insurance Benefits as shown in the Schedule
> of Benefits will continue until the end of the earliest of the
> following dates.
>
> 1.     The date the Employee is no longer Disabled.
> 2.     The date he or she no longer qualifies for Waiver of
>        Premium.
> 3.     The day after the period for which premiums are paid.
> 4.     The date the Maximum Benefit Period for this benefit, if
>        any, ends. LINA 40, 68.

The "Maximum Benefit Period," set forth in the Schedule of Benefits, is "age 65." LINA 31, 34,

63, 64.

The policies also described how an employee could qualify for Waiver of Premium. Both

of the Policies stated:

> In order to qualify for Waiver of Premium an Employee must
> submit due proof that he or she has been Disabled for the Benefit
> Waiting Period shown in the Schedule of Benefits for this benefit.
> Such proof must be submitted to the Insurance Company no later
> than 3 months after the Employee satisfies the Benefit Waiting
> Period. Premiums will be waived from the date the Insurance
> Company agrees in writing to waive premiums for that Employee.
> After premiums have been waived for 12 months, they will be
> waived for future periods of 12 months, if the Employee remains
> Disabled and submits satisfactory proof that Disability continues.
> Satisfactory proof must be submitted to the Insurance Company 3
> months before the end of the 12 month period. LINA 40, 68.

4

According to the Schedule of Benefits for each policy, the Benefit Waiting Period for all eligible employees was "9 months from the date the Employee's Active Service ends." LINA 31, 34, 63, 64.

***Plaintiff's Claim and LINA's Initial Determination***

On July 11, 2008, Jennifer R. Dilbeck, a Senior Benefits Representative at Countrywide, submitted a life insurance claim on behalf of Decedent, identifying plaintiff as her beneficiary. LINA 402-04. That claim sought to recover a total of $208,000—$104,000 each from the Basic and Voluntary Life Insurance Plans—but specifically stated that premiums had been paid only through September 2005. LINA 402-03. However, the claim form also reflected that Decedent had never been required to make any contributions with respect to the Basic Life Insurance. LINA 403.

The claim was assigned to Colleen Spicuzza, a Waiver Claims Specialist. She treated the claim as incorporating a late claim for the Waiver of Premium benefit and attempted to ascertain if there was a reasonable excuse for the delay in filing the claim. As discussed in detail in the Prior M&O, Spicuzza wrote plaintiff a letter, asking plaintiff to "provide a reason why the Waiver of Premium claim was not filed within the guidelines" outlined in the policies. LINA 221. Plaintiff responded by stating that he had been caring for Decedent since 2004, but that Decedent "never received any information from Countrywide nor CIGNA regarding a contract or policy explaining Waiver of Premium standard or an explanation of same." *Id.*

Spicuzza also contacted Dilbeck to ask, *inter alia*, whether Decedent "was ... ever given information or a claim to file for Waiver of Premium benefits when she became disabled." LINA 227. Dilbeck's response to that inquiry and the subsequent correspondence between Spicuzza

5

and Dilbeck is discussed at length in the Prior M&O. For purposes of this memorandum and order, it suffices to note that Dilbeck believed that Decedent had not needed to file a claim for Waiver of Premium because she had already filed for, and was receiving, long-term disability benefits. Dilbeck readily admitted that she was not even aware that a Waiver of Premium form existed and, accordingly, had not asked Decedent to complete such a form. *See* LINA 222.

On August 26, 2008, Spicuzza sent her colleague Jeffrey Vaupel, a "Technical Specialist," a "referral" which summarized what she had learned from plaintiff and Dilbeck. LINA 218. Spicuzza noted that Decedent "resided in New York, ... a reasonable excuse state," and requested that Vaupel "review the beneficiary's and the group's reasons for the late filing." *Id.*

The same day he received Spicuzza's referral, Vaupel sent a memorandum to an in-house attorney, Karen Fortune, seeking legal advice on how to proceed. LINA 114-18. That memorandum explained that plaintiff's claim was "being evaluated as a post-mortem waiver of premium claim," and summarized Vaupel's understanding of the "current guidelines" relating to the claim as follows:

> Ms. Thomas resided in the state of New York, which is classified as a reasonable excuse state. In these states, we will only accept the claim for continued investigation for waiver of premium if it is determined that the claimant's explanation for the late filing of the claim is reasonable. Typically, we must generally view reasonableness as subjective and from the point of view of the claimant. However, in this case, since this claimant was deceased at the time the claim was received, conducting this assessment is rather unique. LINA 117.

After setting forth the facts relating to the claim in detail, the memorandum closed with three questions, including:

- Based on the above information, from a legal standpoint, would the explanation provided by the beneficiary for the late filing of the claim be considered reasonable?

- Is there support based on the available evidence and applicable policy provisions for denial of this claim on the basis of late filing? LINA 118.

About one month later, Fortune responded to Vaupel's inquiries in a five-page memorandum dated September 19, 2008. LINA 108-12. That document, which characterized Vaupel's memorandum as inquiring "whether a postmortem claim for waiver of premium benefits is barred by a defense of late notice of claim," LINA 108, contained a lengthy discussion of legal authorities relating to the issue, including citations to various federal and state cases. That discussion noted, *inter alia*, that "ERISA imposes disclosure requirements on a plan administrator to inform participants of circumstances that may cause them to lose benefits." LINA 111. The discussion specifically noted the plan administrator's duty to provide a Summary Plan Description ("SPD") to its participants and stated, "As ... mentioned above, among other things the SPD must inform participants of the name and type of benefit plan at issue, the plan's requirements with respect to eligibility for participation and benefits and circumstances that may result in disqualification, ineligibility, or denial or loss of benefits." *Id.*

In the conclusion section of the memorandum, Fortune noted, "The file materials do not address what information was provided to Ms. Thomas by Countrywide regarding her life insurance benefits, if any, and specifically her waiver of premium benefit." LINA 112. Accordingly, Fortune advised Vaupel to ask Countrywide for this information, stating:

> [W]e suggest that LINA ask Countrywide to advise what information was provided to Ms. Thomas. A copy of the SPD provided to her would be helpful as would any other information

7

provided to her that dealt with waiver of premium benefits. We point out that Department of Labor regulations control whether the distribution of an SPD is sufficiently broad to allow the assumption that Ms. Thomas received a copy. LINA 112.

Fortune then concluded:

If Countrywide advised participants generally of the requirements of a waiver of premium benefit claim, we believe that a federal court would find that Ms. Thomas was put on notice of what she had to do in order not to lose her benefits. Neither Ms. Thomas (nor her beneficiary) would be able to contend that her delay is excusable due to lack of knowledge, and the court would likely sustain LINA's late notice defense. Assuming (i) Countrywide can supply the information suggested above ... and (ii) ... the SPD ... advises of the notice deadline for claiming waiver of premium benefits, we suggest that LINA deny the claim. Should the facts develop differently, we would like to see this claim again before reaching a final decision on those new facts. LINA 112.

On September 22, 2008, Spicuzza sent Dilbeck another e-mail, inquiring about "what information was provided to Ms. Thomas regarding her life insurance." LINA 205. Dilbeck responded by faxing Spicuzza a portion of an SPD dated January 1, 2004, along with a one-page cover sheet. The cover sheet, which stated that the fax related to "Life Insurance Information," included the following comment:

Please see attached per your request. The oldest information I could find was from 2004 (as you can see the document is dated 1/1/04). This was posted along with several hundred other pages of information regarding Countrywide's various benefits on the Intranet system. Due to the volume of information on the Intranet system, employees rarely read every page of the information available and rely on benefit summaries (such as the inactive packet I sent you previously) to advise them of any action required regarding any change in status. And as mentioned previously, Judith would not have had access to this information once she went out on leave. LINA 183.

On September 25, 2008—two days after Dilbeck faxed the SPD—Vaupel sent an e-mail to Fortune containing two, paragraph-long follow-up questions. LINA 104. In his e-mail, Vaupel expressed uncertainty as to the adequacy of the method Countrywide employed for delivering the SPD, noting that Countrywide employees were "not specifically provided" with copies of the SPD, but that the SPD was made "available for employees to view via their intranet site." *Id.* Vaupel asked: "Would this suffice as putting Ms. Thomas on notice of the waiver of premium and the time period in which to file a waiver of premium claim?" *Id.*

Fortune did not respond to Vaupel's e-mail until October 7, 2008, a few hours after Vaupel sent a follow-up e-mail apologizing for being "a pest" and inquiring whether Fortune "had a chance to review the information" in his previous e-mail. LINA 103. In marked contrast to her earlier, well-researched memo, Fortune's response consisted of a two-paragraph e-mail, devoid of any citations. In the first paragraph, relating to Vaupel's question relating to the SPD, Fortune wrote:

> I'm not certain that the issue of availability of SPD's [*sic*] via website has been tested in litigation. I know that we make ours available on-line and that it has become a common practice. However, if it was Countrywide's practice in 2004 when Ms. Thomas went out on disability, to provide the SPD via the website, then I think we have an argument that she was put on notice of the WOP benefit. In any event, the burden lies with Countrywide to make the SPD available, not LINA. Therefore, we can only rely on the fact that the policyholder made the SPD available to the employee to support our assertion that she was on notice. LINA 103.

On October 10, 2008, Spicuzza wrote plaintiff a six-page letter, denying his claim for life insurance benefits. LINA 161-66. That letter quoted the relevant portions of the Policies and the "Waiver of Premium" section of the SPD and determined, based on those provisions, that

plaintiff's claim for Waiver of Premium benefits should have been filed prior to October 19, 2005—one year after Decedent went out on disability. LINA 164. Spicuzza then opined that the SPD explained "the Waiver of Premium Benefit and the filing provisions and was made available to [Countrywide] employees." LINA 165. After considering plaintiff's "reason for the late submittal of the claim," Spicuzza concluded that "the delay in the filing of your claim was not reasonable." *Id.*

After his claim was denied, plaintiff retained an attorney, Lowell B. Davis. In early April 2009, Davis filed a formal appeal from the denial of plaintiff's claim. LINA 145-48. That appeal raised five points, the fourth of which noted that there was "no evidence that Judith S. Thomas was ever provided with Notice of her obligations with regard to the Waiver of Premium requirements contained in Countrywide's Summary Plan Description." LINA 147.

Within a week of receiving Davis's appeal, Vaupel forwarded it to Fortune along with a request for guidance regarding how to respond to it (LINA 87). For reasons which are unclear, Vaupel's inquiry was forwarded to another in-house attorney, Michael T. Grimes. Grimes ultimately responded to Vaupel's inquiries in an e-mail dated July 22, 2009, proposing replies to each of Davis's five points. LINA 16-17. With respect to Davis's fourth point, Grimes suggested replying as follows:

> [T]he law does not presume a violation of the law. Your suggestion that the [*sic*] Ms. Thomas was not provided with Countrywide's Summary Plan Description ... does not possess any factual support from her Employer, who would have been legally obligated to provide same. Contrary to your assertion that LINA has not produced any evidence demonstrating receipt of either of these documents, it would be incumbent upon the claimant, at this point in time, to establish a failure to comply with ERISA's legal requirements to provide such information. LINA 16.

On July 31, 2009, Vaupel sent Davis a letter denying plaintiff's appeal. LINA 121-27. Vaupel not only relied on the exact same rationale set forth in Spicuzza's letter to plaintiff dated October 10, 2008, but repeated most of Spicuzza's analysis verbatim. Vaupel stated, *inter alia*:

> [R]eview of the information provided for our consideration reflects that information regarding the policies ... was made available to Judith Thomas. Countrywide ... has confirmed that they made available to their employees, via their intranet system, a copy of the Summary Plan Description outlining their coverage under the Group Term Life Insurance policy. The Summary Plan Description made available to Judith Thomas clearly outlines the Waiver of Premium benefit and the filing provision contained within. LINA 125.

Vaupel also addressed each of the five points raised in plaintiff's appeal. With respect to Davis's fourth point, Vaupel cut and pasted Grimes proposed reply—including the typographical error contained therein. LINA 126.

### The Instant Action and the Prior Motion for Summary Judgment

In November 2009, plaintiff commenced this action. The original complaint named two defendants—Cigna and the Bank, as Successor to Countrywide—and alleged two causes of action: a breach of contract claim against Cigna and a negligence claim against Countrywide. That pleading sought compensatory damages of $150,000 and punitive damages of $1 million under each cause of action. After a pre-motion conference, at which plaintiff abandoned the negligence claim and the request for punitive damages, plaintiff filed an amended complaint which added LINA as a defendant and alleged a single cause of action for "breach of contract and violation of ERISA laws." On September 16, 2010, plaintiff filed a Second Amended Complaint which increased the amount of compensatory damages from $150,000 to $208,000.

In August 2011, all of the parties to the action cross-moved for summary judgment. In his motion, plaintiff argued that he was "entitled ... pursuant to 29 U.S.C. [§]1132(a)(1)(b) [*sic*] ... to recover the value of the two life insurance policies wherein he is named beneficiary" and was "entitled to the same relief pursuant to 29 U.S.C. [§]1132(a)(3) and 29 U.S.C. [§]1104(a)." Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment ("Plaintiff's Memo") at 21. In arguing that the decision to deny his claim was "arbitrary and capricious," plaintiff argued that nothing in the Administrative Record showed that LINA "even considered the appropriateness of Countrywide's use of the intranet to disclose plan documents." *Id.* at 19 (emphasis omitted). Plaintiff noted that the "Department of Labor issued rules in 2002 governing the use of electronic media for providing ERISA required disclosures," *id.*, and argued that LINA "refused to investigate claims related to Countrywide's failure to abide by the numerous ERISA regulations relating to disclosure via the intranet." *Id.* at 22 (emphasis omitted). Plaintiff claimed that this "refusal was clearly willful," *id.*, asserting that Fortune "refused to consider the issue of [the] appropriateness" of Countrywide's disclosure of the SPD via intranet, but "simply concluded that it was not Cigna's responsibility." *Id.* at 19 (emphasis omitted).

In their cross-motions for summary judgment, the defendants argued that plaintiff did not have a valid cause of action other than a claim under 29 U.S.C. § 1132(a)(1)(B). With respect to plaintiff's claim under § 1132(a)(1)(B), defendants argued that the decision to deny plaintiff's claim for life insurance benefits should be evaluated under an arbitrary and capricious standard, and that the decision was not arbitrary and capricious. In addition, the Bank argued that it could not be liable for benefits under §1132(a)(1)(B) and that plaintiff could recover benefits, if at all,

only from the Plan. Defendant Bank of America's Memorandum of Law in Support of its Motion for Summary Judgment ("Bank's Memo") at 2-3.

The Court adjudicated these motion in the Prior M&O, issued January 4, 2013. The Court denied the defendants' motions for summary judgment except to the extent that those motions asserted that plaintiff's Second Amended Complaint did not allege any viable claims other than the claim pursuant to 29 U.S.C. §1132(a)(1)(B). The Court also ruled, *inter alia*, that the Bank, in addition to LINA, was a Plan Administrator. Prior M&O, p. 28.

The Court granted plaintiff's motion for summary judgment to the extent of remanding this matter to LINA, as claims administrator, with instructions to further develop the Administrative Record in two respects. First, after discussing at length the Department of Labor ("DOL") regulations pertaining to the furnishing of SPDs through electronic means, the Court directed LINA to investigate the manner in which Countrywide furnished the SPDs to Decedent and to re-evaluate its assumption that Countrywide's practices satisfied those regulations. Second, after noting that the "Waiver of Premium" provisions in the 2004 SPD were contained only in a section discussing the Voluntary Life Insurance Plan, the Court directed LINA to "endeavor to obtain a complete copy of the SPD(s) that were furnished to Decedent" and to "re-evaluate Vaupel's assumption that the SPD placed Decedent on notice of the need to file a Waiver of Premium claim in connection with the Basic Life Insurance Plan." Prior M&O, p. 44.

### Subsequent Developments

The Bank appealed the Prior M&O, primarily claiming that the Court had erred in determining that it was a Plan Administrator. On October 15, 2014, the Second Circuit dismissed that appeal for lack of jurisdiction, holding that the Prior M&O was "not an

13

immediately appealable final order." *Thomas v. Bank of America*, 581 Fed. App'x 39, 41 (2d Cir. 2014). However, the Second Circuit implied that this Court may have overlooked the fact that Countrywide "appointed the Administrative Committee for Employee Benefit Plans to administer the Plan," and that the "Committee in turn delegated to LINA its authority to administer the Plan upon purchasing the Policies." *Id.*, at 40.

While the Bank's appeal was pending, LINA obtained from the Bank some additional evidence relating to the manner in which Countrywide furnished SPDs to Plan participants. First, LINA obtained a declaration from Andrea Smith, a Vice President at the Bank who had previously served as the manager of Countrywide's Leave of Absence Department. Although Smith was first employed by Countrywide on December 20, 2002, she had personal knowledge regarding Countrywide's practices as well as access to records created at the time Decedent started work at Countrywide in May 2002. *See* Declaration of Andrea Smith (hereafter, the "Smith Declaration"), ¶ 1, LINA 530.

According to Smith, Countrywide maintained an "intranet"—*i.e.*, a website accessible only to its employees— called the "HR Café." *Id.*, ¶ 2, LINA 530. The HR Café contained a "Benefits Bookstore," in which employees could "access, view and print information concerning benefits, including life insurance benefits." *Id.* According to Smith, the HR Café—which later became known as HR Central—was available on Countrywide's intranet from at least the date of her employment in December 2002 until April 1, 2009, when Countrywide employees became eligible for benefits through Bank of America. *Id.*, LINA 531

The SPDs governing the Basic and Voluntary Life Insurance Plans were among the benefits information "posted in HR Café." *Id.*, ¶ 3, LINA 531. Although Smith claims that the

14

SPDs were available online, "at the very least, during the years 2002 through April 1, 2009," *id.*, she also implies that the SPDs changed during that period. For example, Smith specifically states that the SPD "effective January 1, 2004, was posted in HR Café as of January 1, 2004." *Id.* The Smith Declaration does not provide any information regarding whether or how this SPD differed from its predecessor(s). Moreover, the Smith Declaration does not allege that any written or electronic notices were sent to the employees when this SPD first became effective.

Indeed, Smith implies that Countrywide never sent the employees notices pertaining to the SPDs. According to Smith, Decedent was "notified that she could access Countrywide's intranet, including the HR Café, by her employment confirmation letter, dated May 13, 2002." *Id.*, ¶ 5, LINA 532. That two-page letter, which was attached to the Smith Declaration as Exhibit D, contained the following paragraph:

> Countrywide offers employees and their dependents a comprehensive benefits package that includes medical, dental, vision, short-term & long-term disability and life insurance subject to benefits eligibility and election. Coverage under these programs commences on the first day of the calendar month following two months of employment. Eligibility requirements and a highlight of these benefits are enclosed. Countrywide employees also may participate in a 401(k) plan and a defined benefit pension plan, subject to the eligibility and other requirements of each of those plans. Additional information about these programs is located in the Benefits Bookstore found on-line in the HR Café on your work computer. Other company benefits, along with guidelines concerning employment with Countrywide, are contained in the Employee Handbook, an electronic copy of which will be provided to you when you start at Countrywide. LINA 534.

The Smith Declaration attached as Exhibit C a document signed by Decedent on May 8, 2002, in which she acknowledged receiving a "copy of the Countrywide Employee Handbook which includes a copy of the Fair Lending Standards and Practices ...." LINA 537. However, the Smith

Declaration did not attach a copy of the handbook itself, or the "highlight of ... benefits" which was allegedly enclosed in Decedent's employment confirmation letter.

Smith states that after Decedent began employment at Countrywide on May 8, 2002, she "could access Countrywide's intranet, including, but not limited to, the HR Café, from her work station ...." Smith Declaration, ¶ 4, LINA 531. This enabled her to "access information concerning basic and supplemental life insurance benefits, including the SPD ...." *Id.* However, while she could access the information "from her work station while she was actively at work," she was only able to access the intranet "until she went on disability leave on October 18, 2004." *Id.*

In addition to obtaining the Smith Declaration and the exhibits thereto, LINA obtained copies of all of the SPDs which were posted on Countrywide's intranet in late 2003 and 2004. These included an SPD for the Countrywide Basic and Voluntary Life Insurance Plans dated September 8, 2003, LINA 1355-68 (the "2003 SPD"), and the entire SPD for the Countrywide Basic and Voluntary Life Insurance Plans effective January 1, 2004, LINA 2168-81 (the "2004 SPD"). There is no evidence in the Administrative Record concerning the SPD which was in effect prior to September 8, 2003, and no evidence regarding when, if ever, the 2004 SPD was superceded.

Although the SPDs, the Smith Declaration, and Exhibits C and D thereto were obtained by LINA's counsel, they were apparently forwarded without comment to Jeffrey Vaupel, the "Technical Specialist" who had authored the July 31, 2009, letter denying plaintiff's appeal. LINA 528. While Vaupel had addressed several questions to in-house counsel prior to issuing that 2009 letter, there is no evidence that Vaupel contacted counsel with legal questions after

receiving this additional information. Rather, on April 24, 2013, Vaupel sent in-house counsel

an e-mail in which he stated, in pertinent part:

> I have completed my review on the remand on the Thomas v.
> LINA matter. After reviewing the documentation submitted by
> Bank of America, it is clear that they made the SPD's [*sic*]
> available to their employee's [*sic*] via their intranet system and
> communicated to the employees that they could access this
> information via the intranet to lear [*sic*] about their benefits. The
> SPD's [*sic*] outline the waiver of premium provisions .... The
> evidence clearly supports that Judith Thomas was placed on notice
> of the Waiver of Premium provisions and the necessary filing
> provisions for making claim for benefits under the policy.
> Therefore, my determination upon review on the remand is to
> uphold the denial of the claim. LINA 527.

Although Vaupel's e-mail attached a draft letter "upholding our decision to deny the claim" for

the attorneys' review and comment, LINA 525, the attorneys provided him with only "minor

edits." LINA 523. None of the e-mails between Vaupel and the attorneys discuss the statutory

and regulatory requirements for furnishing SPDs electronically.

On May 9, 2013, Vaupel sent a seven-page letter to plaintiff's counsel, announcing that

LINA had "determined that Judith Thomas was appropriately informed of her Waiver of

Premium rights under the employer's Life Insurance employee welfare benefit plans and ...

failed to timely exercise those rights within the allowable timeframes." LINA 602 (ellipsis

added). Relying on the Smith Declaration, Vaupel stated that Countrywide made the SPDs

"available to their employees via their intranet site, the HR Café, later known as HR Central,

which housed Countrywide's benefit information, including, but not limited to, information

concerning basic and voluntary life insurance benefits" and that "employees were able to access,

view and print information concerning benefits" from this website. LINA 607. Vaupel

concluded that Decedent, as a Countrywide employee, "had access to Countrywide's intranet ... from her work station while she was actively at work." *Id.*

Vaupel also found that Decedent had been "notified that she could access Countrywide's intranet, including the HR Café, in her employment confirmation letter dated May 13, 2002." *Id.* Vaupel noted that "[t]his letter instructed that information on benefits was available to her in the "Benefits Bookstore found on-line in the HR Café on her work computer."" *Id.* Vaupel stated that LINA had "secured copies of the 2003 and 2004 Summary Plan Descriptions that were made available to employees ... via the HR Café," *id.*, but did not assert that any notices had been sent to the employees at the time these SPDs went into effect.

Vaupel claimed that the 2003 and 2004 SPDs "clearly outline the Waiver of Premium benefit and the necessary filing provisions for making claims for benefits under the basic and voluntary life insurance plans." *Id.* In support of this point, Vaupel quoted a paragraph entitled "Waiver of Premium," LINA 606, and asserted that this paragraph was contained in the 2003 and 2004 SPDs "under the section "Countrywide Basic and Voluntary Life Insurance Plans." LINA 605. Vaupel did not mention that the paragraph was included in the subsection entitled, "How the Voluntary Life Insurance Plan Works," but not in the section entitled, "How the Basic Life Insurance Plan Works."

Vaupel concluded that the information obtained on remand provided "clear confirmation that Judith Thomas was placed on notice of the Waiver of Premium provisions and the necessary filing provisions for making claim [*sic*] for benefits under the policy." LINA 607. Accordingly, he determined, *inter alia*, that "the delay in the filing of Judith Thomas' claim was not reasonable ...." *Id.* However, while Vaupel's letter stated that LINA's review was "in response to the Court

Ordered Remand issued by [the Court]," *id.*, it did not even mention the regulations relating to the furnishing of SPDs through electronic means, which were discussed at length in the Prior M&O.

### The Instant Motions for Summary Judgment

Plaintiff and the Insurers now cross-move for summary judgment for a second time. In their Memorandum of Law in Support of their Motion for Summary Judgment (the "Insurers' Memo"), the Insurers argue that LINA's decision was not arbitrary and capricious because Countrywide provided "adequate notice" of the Waiver of Premium provisions, but the Decedent's Waiver of Premium claim was nonetheless filed years late. With respect to notice, the Insurers note that, when ERISA requires that certain materials be "furnished " to plan participants, plan administrators are required to "use measures reasonably calculated to ensure actual receipt of the material by plan participants, beneficiaries and other specified individuals." Insurers' Memo, p. 9-10. The Insurers further note that the plan administrator is not required to establish that a plan participant actually received the materials, but "only that it complied with the C.F.R.'s provisions, which are designed to mandate "measures reasonably calculated to ensure actual receipt of the material ..." *Id.*, p. 12.

The Insurers acknowledge that 29 C.F.R. § 2520.104b-1(c) provides "specific guidelines" for disclosing materials "through electronic media, such as company intranets." *Id.*, p. 10. Indeed, the Insurers quote the entirety of § 2520.104b-1(c)(1) which requires, *inter alia*, that notice be provided "to each participant, beneficiary or other inidividual, in electronic or non-electronic form, at the time a document is furnished electronically, that apprises the individual of the significance of the document when it is not otherwise reasonably evident as transmitted ...

19

and of the right to request and obtain a paper version of such document ...." *Id.* (quoting 29 C.F.R. § 2520.104b-1(c)(1)(iii)) (ellipses added). The Insurers assert that Countrywide complied with this contemporaneous notice requirement simply "by providing notice in the employment confirmation letter and in the employee handbook," *id.*, p. 11, but do not assert that participants received any further notices.

The Insurers also acknowledge that 29 C.F.R. § 2520.104b-1(c)(2) places limitations on the type of participants to whom materials may be furnished via electronic means. This subsection states that the participants must have "the ability to effectively access documents in electronic form at any location where the participant is reasonably expected to perform his or her duties as an employee" and that "access to the employer's or plan sponsor's electronic information system" must be "an integral part of those duties." 29 C.F.R. § 2520.104b-1(c)(2). Relying on the Smith Declaration—which asserted that Decedent had access to Countrywide's intranet through her work station but which never discussed Decedent's duties—the Insurers argue that Decedent met these requirements because she "had the ability to access the documents in electronic form at her work station, and the use of the computer (with intranet access) was part of her work duties." Insurers' Memo, p. 12 (citing LINA 532, 534-35 and 56.1 Statement ¶ 46, which is based on LINA 532, 534-35). The Insurers conclude that "Countrywide's procedures complied with the requirements of 29 C.F.R. § 2520.104b-1(c), and LINA's determination that Ms. Thomas was placed on notice of the waiver of premium claim requirements was not arbitrary and capricious." Insurers' Memo, p. 13.

Plaintiff's motion for summary judgment principally argues that Vaupel's May 9, 2013, letter "failed to identify any evidence that revealed how Countrywide made its SPD available, to

persons no longer in active service, in compliance with 29 C.F.R. § 2520.104b[-1](c)(1)(iii)."

Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment

("Plaintiff's Memo"), p. 5 (brackets added). Plaintiff urges the Court to disregard the Smith

Declaration altogether, arguing that Smith lacked personal knowledge of how Countrywide

furnished the SPDs to plan participants, and that she "previously swore in response to

supplemental interrogatories ... not to have personal knowledge as to the manner in which

Countrywide made its SPD's [sic] available electronically." *Id.*, p. 12. Plaintiff also argues,

based on *Gertjejansen v. Kemper Ins. Cos.*, 274 Fed. App'x 569, 570 (9th Cir. 2008), and

*Nebesny-Fender v. American Airlines, Inc.*, 818 F. Supp. 2d 1319, 1333 (S.D. Fla. 2011), that

"[m]erely placing documents on a company web site" is insufficient to satisfy the regulations.

Plaintiff's Memo, p. 10.

Plaintiff does not address the question of whether the SPDs themselves were adequate to

put the Decedent on notice of the Waiver of Premium requirements, asserting in a footnote that

the failure to furnish the SPDs in accordance with the regulations makes it unnecessary to

"review the SPD to see if it properly placed the decedent on Notice of the Waiver of Premium

requirements." *Id.*, p. 4, n. 1. However, plaintiff urges the Court to award attorney's fees under

29 U.S.C. § 1132(g)(1). In making this argument, plaintiff relies exclusively on *Chambless v.*

*Masters, Mates & Pilots Pension Plan*, 815 F.2d 869 (2d Cir. 1987), which sets forth five factors

which the Court may consider in deciding whether to award attorney's fees:

> 1) the degree of the offending party's culpability or bad faith, (2)
> the ability of the offending party to satisfy an award of attorney's
> fees, (3) whether an award of fees would deter other persons from
> acting similarly under like circumstances, (4) the relative merits of

the parties' positions, and (5) whether the action conferred a common benefit on a group of pension plan participants.

*Chambless*, 815 F.2d at 871. Plaintiff then addresses each of these factors.

## *DISCUSSION*

### *I. The Summary Judgment Standard*

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may [, *inter alia*] ... consider the fact undisputed for purposes of the motion [or] ... grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e) (brackets and ellipses added).

### *II. Plaintiff's Claims under 29 U.S.C. §1132(a)(1)(B)*

As this Court ruled in its Prior M&O, the only viable claim in plaintiff's Second Amended Complaint is the claim under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). This provision section permits a plan participant or beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan,

or to clarify his rights to future benefits under the terms of the plan." This is "the workhorse of ERISA remedy law [, the provision] under which routine benefit denial and other ERISA claims proceed." *Wilkins v. Mason Tenders Dist. Council Pension Fund*, 445 F.3d 572, 578 (2d Cir. 2006) (brackets in original). "A claim under this section, in essence, is the assertion of a contractual right under a benefit plan." *Strom v. Goldman, Sachs & Co.*, 202 F.3d 138, 142 (2d Cir. 1999) (citing *Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1133 (7th Cir. 1992)).

### A. The Arbitrary and Capricious Standard

As this Court held in its Prior M&O, LINA's decision to deny plaintiff's life insurance claims must be evaluated under an arbitrary and capricious standard. This is a "highly deferential standard of review," under which a court "cannot substitute its judgment for that of the Plan Administrator." *Fuller v. J.P Morgan Chase & Co.*, 423 F.3d 104, 107 (2d Cir. 2005). In cases in which this standard applies, "[a] court may overturn a plan administrator's decision to deny benefits only if the decision was without reason, unsupported by substantial evidence or erroneous as a matter of law." *Durakovic v. Building Service 32 BJ Pension Fund*, 609 F.3d 133, 141 (2d Cir. 2010) (quoting *Celardo v. GNY Automobile Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003)). For purposes of arbitrary-and-capricious review, "[s]ubstantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator ...." *Durakovic*, 609 F.3d at 141 (quoting *Celardo*, 318 F.3d at 146). There must be more than a "scintilla" of evidence supporting the administrator's decision, but "less than a preponderance" will suffice. *Id.* However, while "the plan administrator's interpretation of the plan 'will not be disturbed if reasonable,'" a deferential standard of review "does not mean that the plan administrator will prevail on the merits."

*Conkright v. Frommert*, 559 U.S. 506, 521 (2010) (quoting *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989)).

While it is beyond dispute that "a plan under which an administrator both evaluates and pays benefits claims creates [a] conflict of interest," *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008), this conflict of interest does not justify *de novo* review of the administrator's decision. *See Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105 (2008) (overruling cases which applied a *de novo* standard of review in cases in which a plaintiff proved both that a conflict of interest existed and that this conflict affected the reasonableness of the administrator's discretionary decision). However, courts must take such conflicts of interest "into account ... as a factor in determining whether there was an abuse of discretion." *McCauley*, 551 F.3d at 133. Where there is evidence of such a conflict of interest, a court must "(1) discuss the evidence allegedly showing that [the administrator's] conflict of interest influenced its decision-making, (2) determine what role [the administrator's] conflict of interest may have played in its decision, and (3) give that conflict any weight, as required by *Glenn*," *supra*. *Hobson v. Metropolitan Life Ins. Co.*, 574 F.3d 75, 83 (2d Cir. 2009).

### B. Plaintiff's Arguments

In this case, LINA "determined that Judith Thomas was appropriately informed of her Waiver of Premium rights under her employer's Life Insurance employee welfare benefit plans ... and failed to timely exercise those rights within the allowable timeframes." LINA 602 (ellipsis added). The first part of this determination—that Decedent was "appropriately informed"—was based on Smith's representations that the SPDs which discussed the Waiver of Premium benefit were posted on Countrywide's intranet and that "employees were able to access, view and print

24

information concerning benefits" from the HR Café. LINA 607. Plaintiff argues that this determination was arbitrary and capricious because it was (1) unsupported by credible evidence and (2) erroneous as a matter of law.

### 1. The Admissibility of the Smith Declaration

In the course of arguing that LINA's decision was unsupported by substantial evidence, plaintiff tacitly questions the admissibility of the Smith Declaration. Plaintiff primarily asserts that Smith, who began working at Countrywide about seven and one-half months after Decedent was hired, lacks personal knowledge of how Countrywide furnished the SPDs to plan participants. In addition, plaintiff asserts that Smith's Declaration contradicts her own earlier statements, claiming that Smith "previously swore in response to supplemental interrogatories ... not to have personal knowledge as to the manner in which Countrywide made its SPD's [*sic*] available electronically." Plaintiff's Memo, p. 12 (ellipsis added). Neither of these assertions is correct.

First, Smith does not profess to have personal knowledge of all the facts set forth in her declaration. To the contrary, the Smith's Declaration expressly states that it is not based solely on Smith's "own personal knowledge," but also on records to which Smith has had access during her years of employment at Countrywide and Bank of America. Smith Declaration, ¶ 1, LINA 530. Second, this Court has reviewed the responses to plaintiff's supplemental interrogatories, which are included in Exhibit I to the Declaration of Lowell B. Davis, Submitted in Support of Plaintiff's Motion for Summary Judgment on Remand, and which are verified by Smith. That verification states that the responses to the interrogatories are based on information obtained from unspecified employees and "do not represent the personal knowledge" of Smith. This does

not imply that Smith lacks personal knowledge, but only that the responses are not based on that knowledge. Moreover, the supplemental interrogatories did not ask about the manner in which Countrywide furnished SPDs to plan participants.

### 2. The Legal Requirements for SPDs

Plaintiff's second argument—that LINA's determination was erroneous as a matter of law—challenges LINA's conclusion that Countrywide "appropriately informed" Decedent of her Waiver of Premium rights by making the SPDs which informed her of those rights available on the intranet. To evaluate that argument, one must first examine the statutory requirements relating to SPDs and the regulations relating to the furnishing of those SPDs through electronic means.

#### a. The Statutory Requirements

Section 104(b)(1) of ERISA, 29 U.S.C. § 1024(b)(1), requires the administrator of an employee benefit plan to "furnish" each participant with a copy of the summary plan description ("SPD") at specified times and intervals. At all time relevant to this action, section 104(b)(1) has required a plan administrator to furnish the SPD to each participant "within 90 days after he becomes a participant" or within 120 days after the plan becomes subject to ERISA. 29 U.S.C. § 1024(b)(1). In addition, "[i]f there is a modification to the plan or change of the sort described in [29 U.S.C. § 1022(a)] ... a summary description of such modification or change must be furnished not later than 210 days after the end of the plan year in which the change is adopted." 29 U.S.C. § 1024(b)(1). The sort of change described in section 1022(a) is "any change in the information required under [§ 1022(b)]."

Section 1022(b) contains a list of information which must be contained in the summary plan description. That information includes, *inter alia*, "the plan's requirements respecting eligibility for participation and benefits; ... circumstances which may result in disqualification, ineligibility, or denial or loss of benefits; ... [and] the procedures to be followed in presenting claims for benefits under the plan including the office at the Department of Labor through which participants and beneficiaries may seek assistance or information regarding their rights under this chapter ...." 29 U.S.C. § 1022(b). These provisions were enacted to "ensur[e] that the individual participant knows exactly where he stands with respect to the plan." *Leyda v. AlliedSignal, Inc.*, 322 F.3d 199, 208 (2d Cir. 2003) (quoting *Firestone Tire & Rubber Co.*, 489 U.S. at 118 (brackets added in *Leyda*; internal quotation marks in *Firestone* omitted). The SPD serves as "an employee's primary source of information regarding employment benefits, and employees are entitled to rely on the descriptions contained in the summary." *Tocker v. Philip Morris Cos., Inc.*, 470 F.3d 481, 488 (2d Cir. 2006) (quoting *Heidgerd v. Olin Corp.*, 906 F.2d 903, 907 (2d Cir. 1990))

Before turning to the regulations relating to the disclosure of SPDs through electronic means, it is important to note that the preceding statutes require that the SPD be "furnished," not simply made available. ERISA requires the administrator of an employee benefit plan covered by Title I of the Act to make certain disclosures to participants, beneficiaries and other specified individuals. As the DOL—"the agency charged with administering and enforcing Title I," *Faber v. Metropolitan Life Ins. Co.*, 648 F.3d 98, 105 (2d Cir. 2011)—explains in its regulations:

> Disclosure under Title I ... generally takes three forms. First, the plan administrator must, by direct operation of law, furnish certain material to all participants covered under the plan and beneficiaries

receiving benefits under the plan (other than beneficiaries under a welfare plan) at stated times or if certain events occur. Second, the plan administrator must furnish certain material to individual participants and beneficiaries upon their request. Third, the plan administrator must make certain material available to participants and beneficiaries for inspection at reasonable times and places.

29 C.F.R. § 2520.104b-1(a).

### b. The Regulations Regarding Furnishing SPDs

The DOL has issued detailed rules and regulations regarding how to satisfy section 104(b)(1)(A) of ERISA. At all time relevant to this action, the DOL has taken the position that materials can be furnished through "measures reasonably calculated to ensure actual receipt of the material by plan participants, beneficiaries and other specified individuals." 29 C.F.R. § 2520.104b-1(b)(1). Moreover, materials which are "required to be furnished to all participants covered under the plan and beneficiaries receiving benefits under the plan (other than beneficiaries under a welfare plan) must be sent by a method or methods of delivery likely to result in full distribution." *Id.* The regulations specifically endorse certain methods of delivery, such as "in-hand delivery to an employee at his or her worksite" or publication of the material "as a special insert in a periodical distributed to employees ... if the distribution list for the periodical is comprehensive and up-to-date and a prominent notice on the front page of the periodical advises readers that the issue contains an insert with important information about rights under the plan and the Act which should be read and retained for future reference." *Id.* The regulations also expressly permit materials to be furnished by first-class mail, but provide that second- or third-class mail "is acceptable only if return and forwarding postage is guaranteed and address

correction is requested." *Id.* However, the regulations caution that "in no case is it acceptable merely to place copies of the material in a location frequented by participants." *Id.*

Prior to 1997, the regulations did not contain any provisions relating to furnishing materials through electronic means. In 1996, however, section 101(c) of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") amended section 104(b)(1) of ERISA to provide that "[t]he Secretary [of Labor] shall issue regulations within 180 days after August 21, 1996, providing alternative mechanisms to delivery by mail through which group health plans (as so defined) may notify participants and beneficiaries of material reductions in covered services or benefits." Although HIPAA did not require that the DOL issue regulations permitting the use of electronic means, the legislation prompted the DOL to "establish, on an interim basis, a 'safe harbor' on which administrators of group health plans may rely in delivering plan disclosures through electronic media." Interim Rules Amending ERISA Disclosure Requirements for Group Health Plans, 62 Fed. Reg. 16979, 16982, 1997 WL 158925 (adopted Apr. 8, 1997). However, the DOL noted that its amendment of the regulations was "not intended to represent the exclusive means by which the requirements of § 2520.104b-1 may be satisfied in using electronic media as a method of delivering plan disclosures." *Id.*

The "safe harbor" was codified in 29 C.F.R. § 2520.104b-1(c), which provided:

> (1) The administrator of a group health plan furnishing documents described in section 104(b)(1) of the Act through electronic media will be deemed to satisfy the requirements of paragraph (b)(1) of this section with respect to participants described in paragraph (c)(2) of this section if:
>
> > (i) The administrator takes appropriate and necessary measures to ensure that the system for furnishing documents results in actual receipt by

participants of transmitted information and documents (e.g., uses return-receipt electronic mail feature or conducts periodic reviews or surveys to confirm receipt of transmitted information);

(ii) Electronically delivered documents are prepared and furnished in a manner consistent with the applicable style, format and content requirements (See 29 CFR 2520.102-2 through 2520.102-5);

(iii) Each participant is provided notice, through electronic means or in writing, apprising the participant of the document(s) to be furnished electronically, the significance of the document (e.g., the document describes changes in the benefits provided by your plan) and the participant's right to request and receive, free of charge, a paper copy of each such document; and

(iv) Upon request of any participant, the administrator furnishes, free of charge, a paper copy of any document delivered to the participant through electronic media.

29 C.F.R. § 2520.104b-1(c)(1).

Paragraph (c)(2) provided that the furnishing of documents through electronic media would be deemed to satisfy the requirements of paragraph (b)(1) only with respect to participants who had (1) "the ability to effectively access at their worksite documents furnished in electronic form" and (2) "the opportunity at their worksite location to readily convert furnished documents from electronic form to paper form free of charge." 29 C.F.R. § 2520.104b-1(c)(2)(i) and (ii). In explaining why it limited electronic disclosure to these participants, the DOL stated its belief that "the critical determination in assessing the adequacy of the system, as a means for communicating to plan participants" was "the extent to which participants can readily access and

retain the delivered information." Interim Rules Amending ERISA Disclosure Requirements for Group Health Plans, 62 Fed. Reg. at 16982.

The "safe harbor" went into effect on June 1, 1997. 29 C.F.R. § 2520.104b-1(c)(3). The regulations remained unchanged from 1997 until March 8, 2002, when the regulations were amended in ways that are irrelevant to this case. Accordingly, at the time the Decedent was hired by Countrywide in May 2002, the 1997 "safe harbor"—which, by its terms, applied only to group health insurance plans—was still in effect. However, on April 9, 2002, DOL issued a Notice of Final Rulemaking which expanded the "safe harbor." Although the new regulations did not become effective until October 9, 2002, those regulations and the Notice of Final Rulemaking provided guidance as to the circumstances under which electronic disclosure adequately ensures actual receipt of the material by plan participants.

The regulations adopted in April 2002 amended both paragraphs (c)(1) and (c)(2) of 29 C.F.R. § 2520.104b-1. Paragraph (c)(1) was amended in two notable respects. First, the "safe harbor" was extended to all employee benefit plans, not just group health insurance plans. Second, paragraph (c)(1)(i) was amended to require the administrator to take "appropriate and necessary measures reasonably calculated to ensure that the system for furnishing documents... [p]rotects the confidentiality of personal information relating to the individual's accounts and benefits ...." Although there were other, stylistic changes to paragraph (c)(1), that paragraph was otherwise largely unchanged.[2]

_____

[2]As amended, paragraph (c)(1) read as follows:

(1) Except as otherwise provided by applicable law, rule or regulation, the administrator of an employee benefit plan furnishing documents through electronic media is deemed to satisfy the requirements of paragraph (b)(1) of this section with respect to an individual described in paragraph (c)(2) if:

In contrast, paragraph (c)(2)—which delineated the participants and beneficiaries to whom electronic disclosure could be made—was entirely reworked. As amended, this paragraph provided, in pertinent part:

> Paragraph (c)(1) shall only apply with respect to the following individuals:

---

> (i) The administrator takes appropriate and necessary measures reasonably calculated to ensure that the system for furnishing documents—
>
>> (A) Results in actual receipt of transmitted information (e.g., using return-receipt or notice of undelivered electronic mail features, conducting periodic reviews or surveys to confirm receipt of the transmitted information); and
>>
>> (B) Protects the confidentiality of personal information relating to the individual's accounts and benefits (e.g., incorporating into the system measures designed to preclude unauthorized receipt of or access to such information by individuals other than the individual for whom the information is intended);
>
> (ii) The electronically delivered documents are prepared and furnished in a manner that is consistent with the style, format and content requirements applicable to the particular document;
>
> (iii) Notice is provided to each participant, beneficiary or other individual, in electronic or non-electronic form, at the time a document is furnished electronically, that apprises the individual of the significance of the document when it is not otherwise reasonably evident as transmitted (e.g., the attached document describes changes in the benefits provided by your plan) and of the right to request and obtain a paper version of such document; and
>
> (iv) Upon request, the participant, beneficiary or other individual is furnished a paper version of the electronically furnished documents.

(i) A participant who—

>   (A) Has the ability to effectively access documents furnished in electronic form at any location where the participant is reasonably expected to perform his or her duties as an employee; and

>   (B) With respect to whom access to the employer's or plan sponsor's electronic information system is an integral part of those duties; or

(ii) A participant, beneficiary or any other person entitled to documents under Title I of the Act or regulations issued thereunder (including, but not limited to, an "alternate payee" within the meaning of section 206(d)(3) of the Act and a "qualified beneficiary" within the meaning of section 607(3) of the Act) who—

>   (A) Except as provided in paragraph (c)(2)(ii)(B) of this section, has affirmatively consented, in electronic or non-electronic form, to receiving documents through electronic media and has not withdrawn such consent;

>   (B) In the case of documents to be furnished through the Internet or other electronic communication network, has affirmatively consented or confirmed consent electronically, in a manner that reasonably demonstrates the individual's ability to access information in the electronic form that will be used to provide the information that is the subject of the consent, and has provided an address for the receipt of electronically furnished documents ....

The remainder of paragraph (c)(2) specified the contents of a "clear and conspicuous statement" which would have to be provided to the participant prior to his or her consent and steps to be followed "if a change in hardware or software requirements needed to access or retain electronic

documents creates a material risk that the individual will be unable to access or retain electronically furnished documents."

In the Notice of Final Rulemaking which announced the adoption of these new regulations, the DOL provided further guidance with respect to certain provisions of paragraphs (c)(1) and (c)(2) in the course of addressing suggestions which had been made concerning the proposed amendment. First, the DOL specifically rejected a suggestion that the DOL permit notices required under paragraph (c)(1)(iii) to be "included as part of regular mailings or e-mails (*e.g.*, with account statements) annually." The DOL stated:

> The required notice is intended to bring to the attention of participants and beneficiaries at the time of the electronic disclosure that they have been furnished important plan information. The Department believes that merely furnishing a general notice on a periodic basis would not accomplish this goal. For purposes of the safe harbor, therefore, the Department believes that the timing of the notice must be governed by the time frame applicable to the required disclosure .... Nothing in the safe harbor, however, is intended to preclude the furnishing of the required notice with other information relating to the plan or plan sponsor. In such cases, however, care should be taken to ensure that the required notifications are sufficiently conspicuous to alert participants and beneficiaries to electronically furnished documents. The Department has also clarified that the requirement that the notice apprise each participant and beneficiary of the significance of the document being provided electronically applies only where the significance of the document may not be reasonably evident from the transmittal, such as where it is an attachment to an e-mail.

Final Rules Relating to Use of Electronic Communication and Recordkeeping Technologies by Employee Pension and Welfare Benefit Plans, 67 FR 17264, 17267, 2002 WL 520995 (adopted Apr. 9, 2002).

Second, the DOL rejected recommendations that paragraph (c)(2)(i)(B) be changed to eliminate the requirement that access to the employer's or plan sponsor's information system be "an integral part" of the participant's duties. Although those who had made these recommendations argued that "the availability of a computer kiosk in a common area at a participant's workplace should be sufficient to satisfy the access requirement," the DOL disagreed, stating:

> [T]he actual location of an employee's work is less important than the employee being expected to regularly access the employer's electronic information system and, therefore, more likely to receive timely communication of plan information. The Department has long held the view that, where documents are required to be furnished to participants, it is not acceptable merely to make the documents available in a location frequented by participants. *See* § 2520.104b-1(b). The Department believes that, even where a participant is otherwise provided notice of the availability of a document, requiring participants to physically seek out the documents in common areas of the workplace will be a disincentive for participants to obtain and review important information affecting their rights, benefits, and obligations under their plan. Accordingly, while the use of electronic information systems in common areas of the workplace may be an appropriate means by which to make plan information available for inspection, as a supplemental method of disclosure, or as a way to access additional non-mandated materials, it is not an appropriate means by which to deliver documents required to be furnished to participants.

Final Rules Relating to Use of Electronic Communication and Recordkeeping Technologies by Employee Pension and Welfare Benefit Plans, 67 FR at 17265.

Third, the DOL responded to a request that it "clarify whether the safe harbor would apply to disclosures of plan information maintained in a separate section of a company's website

that is easily accessible from its home page with access generally restricted to employees and others by password and PIN requirements." The DOL responded:

> The Department believes that using a company's website as a method of providing information is similar to using an insert to a company publication, which is cited in the general standard in 29 CFR 2520.104b-1(b) as an acceptable method of "furnishing" disclosures within the meaning of the regulation provided the distribution list for the periodical is comprehensive and up-to-date and a prominent notice appears on the front page of the publication advising readers that the publication contains important information about rights under the plan. A plan administrator relying on such website disclosure must still satisfy all the conditions of the safe harbor. For example, participants and beneficiaries would have to be notified of the availability of the particular disclosure document and its significance by sending written or electronic notice, as described in § 2520.104b-1(c)(1)(iii), directing them to the document on the website, and the administrator would still be required to take appropriate and necessary measures to ensure the website system for furnishing documents results in actual receipt, e.g., the website homepage should contain a prominent link to the website sections that contain information about the plan, the website should include directions on how to obtain a replacement for a lost or forgotten password to the extent one is needed, and disclosure documents should remain on the website for a reasonable period of time after participants and beneficiaries are notified of their availability.

Final Rules Relating to Use of Electronic Communication and Recordkeeping Technologies by Employee Pension and Welfare Benefit Plans, 67 FR at 17268.

The 2002 amendments to 29 C.F.R. § 2520.104b-1(c) became effective on October 9, 2002. Section 2520.104b-1(c) has not been revised since.

### c. The Failure to Furnish the SPDs at Issue

The Administrative Record in this case does not contain evidence that Decedent was ever furnished with an SPD in accordance with the statutes and regulations set forth above. First,

there is no evidence that Decedent was furnished with an SPD through any means other than electronic media. The only written document which Decedent received regarding her benefits was the two-page employment confirmation letter dated May 13, 2002. Although that letter claimed to enclose "[e]ligibility requirements and a highlight" of the employee benefits provided by Countrywide, LINA 534, the Administrative Record does not include a copy of this enclosure or a description of it. In this regard, this case is entirely unlike *Watson v. Consolidated Edison*, 645 F. Supp. 2d 291 (S.D.N.Y. 2009), and *Hunter v. Lockheed Martin Corp.*, No. C-99-20996 RMW, 2002 WL 1492137 (N.D.Cal. 2002)—both of which are cited in the Insurers' Memo, pp. 12-13. In *Watson*, an SPD was distributed to "each Consolidated Edison employee at their worksite, and subsequently posted ... on Consolidated Edison's internal website." 645 F. Supp. 2d at 298 (ellipsis added). In *Hunter*, there was evidence that copies of SPDs were "personally distributed" to employees when they commenced employment or changed status. 2002 WL 1492137, at *2-3.

The Administrative Record also does not contain enough information to ascertain whether Decedent was the sort of participant who could be furnished with an SPD through electronic means. The safe harbor contained in the regulations adopted in April 2002 permitted the furnishing of materials through electronic means only to a participant with "(A) ... the ability to effectively access documents furnished in electronic form at any location where the participant is reasonably expected to perform his or her duties as an employee; and (B) [w]ith respect to whom access to the employer's or plan sponsor's electronic information system is an integral part of those duties." 29 C.F.R. § 2520.104b-1(c)(2)(i) (ellipses and brackets added). In discussing the limitation set forth in subsection (c)(2)(i)(B), the DOL emphasized that those participants

who were "expected to regularly access the employer's electronic information system" were "more likely to receive timely communication of plan information." Final Rules Relating to Use of Electronic Communication and Recordkeeping Technologies by Employee Pension and Welfare Benefit Plans, 67 FR at 17265.

In this case, there is no evidence in the Administrative Record concerning Decedent's duties. Decedent's employment confirmation letter, dated May 13, 2002, offered her a position as a "Home Loan Consultant - External." LINA 534. The life insurance claim which Dilbeck filed on behalf of Decedent in July 2008 listed Decedent's occupation as "Home Loan Consultant." LINA 403. However, there is no evidence relating to the duties of a "Home Loan Consultant," External or otherwise. Although the Smith Declaration stated that Decedent "could access Countrywide's intranet, including ... the HR Café, from her work station," Smith Declaration, ¶ 4, LINA 531, the declaration provided no evidence that access to Countrywide's electronic information system was "an integral part" of Decedent's duties or that she was "expected to regularly access" that system.

Even assuming that LINA could adduce evidence to establish that Decedent was the sort of participant who could receive electronic disclosures under § 2520.104b-1(c)(2)(i), the Administrative Record establishes that the SPDs were not furnished in accordance with the requirements of § 2520.104b-1(c)(1)(iii). That provision requires that participants to whom materials are furnished electronically be provided with an electronic or written notice "at the time a document is furnished ..., that apprises the individual of the significance of the document when it is not otherwise reasonably evident as transmitted (e.g., the attached document describes changes in the benefits provided by your plan) and of the right to request and obtain a paper

version of such document." There is no evidence that Decedent ever received any such notice. Indeed, the only document in the Administrative Record which might arguably qualify as the required notice was the two-page employment confirmation letter dated May 13, 2002. LINA 534-35. However, that document did not apprise Decedent of the documents being furnished electronically or the significance of those documents, and did not inform her of her right to request and obtain a paper version of each such document. Rather, the employment confirmation letter merely stated that Countrywide offered a "comprehensive benefits package" that included life insurance and that "information about these programs" was available on the intranet. LINA 534.

Even if the employment confirmation letter could be construed as adequate notice under § 2520.104b-1(c)(1)(iii), there is no evidence that the SPD which existed in 2002 contained information regarding the Waiver of Premium benefit. Decedent became a participant in the Basic and Voluntary Life Insurance Plans as of August 1, 2002, but Countrywide did not become a subscriber to the life insurance policies at issue until January 1, 2003. The Administrative Record does not contain any evidence relating to the life insurance policies which protected Countrywide employees prior to 2003. Accordingly, even if there were evidence that Decedent was properly furnished with an SPD within 90 days after she became a participant in the Plans on August 1, 2002, there would be no evidence that the SPD she was furnished informed her of the Waiver of Premium benefit and the requirements for claiming this benefit.

Furthermore, there is no evidence that Decedent was provided with any notice at the time subsequent SPDs were posted on the intranet. The Administrative Record contains two SPDs for the Countrywide Basic and Voluntary Life Insurance Plans: the 2003 SPD dated September 8,

2003, LINA 1355-1377, and the 2004 SPD, effective January 1, 2004, LINA 2168-2181. These SPDs contain information concerning the Waiver of Premium benefits and allegedly placed Decedent and plaintiff on notice that they needed to file a Waiver of Premium claim. Yet, there is nothing in the Administrative Record to suggest that Decedent received notice through any means, electronic or otherwise, when these new SPDs went into effect. Indeed, there is not even any evidence that Countrywide provided general notices on a periodic basis.

While the Administrative Record indicates that the SPDs were made available to active employees on Countrywide's intranet, "the mere availability of a document on a company website is not enough under ERISA." *Nebesny-Fender v. American Airlines, Inc.*, 818 F. Supp. 2d 1319, 1333 (S.D. Fla. 2011) (citing *Larsen v. Airtran Airways*, Inc., No. 07-cv-442, 2009 WL 4827522, *9 (M.D. Fla. 2009) ("The fact that the SPD may have been available for review does not excuse the breach" of the applicable regulations.)). Posting SPDs on the intranet without notice to the participant is tantamount to "plac[ing] copies of the material in a location frequented by participants," and "does not qualify as effective notification under ERISA's guidelines ...." *Rosenberg v. CNA Financial Corp.*, No. 04 C 8219, 2007 WL 2126085, at * 10 (N.D.Ill. July 23, 2007) (brackets and ellipsis added).

Under the regulations, SPDs may be furnished through electronic means only as long as the plan administrator "takes appropriate and necessary measures reasonably calculated to ensure that the system for furnishing documents ... [r]esults in actual receipt of transmitted information." 29 C.F.R. § 2520.104b–1(c)(1)(i). However, there is nothing "to suggest that the mere placement of an updated SPD on [an] intranet site could ensure that [a participant] would actually receive the transmitted information." *Gertjejansen v. Kemper Ins. Cos.*, 274 Fed.Appx. 569, 570 (9th

Cir. 2008) (summary order) (brackets added). As Sixth Circuit Judge Helene N. White has observed: "It would be strange, indeed, for a plaintiff in an ERISA suit to be understood to have actual knowledge of the information in an SPD that was not sufficiently furnished to the plaintiff under ERISA's own standards." *Brown v. Owens Corning Inv. Review Committee*, 622 F.3d 564, 578 (6th Cir. 2010) (White, J., concurring). Indeed, a finding that an administrator could furnish SPDs by placing them on the intranet without any notice whatsoever would render the DOL's carefully crafted regulations entirely superfluous.

In light of the foregoing, this Court concludes that LINA's determination that Decedent "was appropriately informed of her Waiver of Premium rights under the employer's Life Insurance employee welfare benefit plans," LINA 602, was arbitrary and capricious in that it was both "unsupported by substantial evidence" and "erroneous as a matter of law." *See Durakovic*, 609 F.3d at 141. Moreover, the manner in which Vaupel reached his determination to deny plaintiff benefits upon remand suggests that his judgment was clouded by the conflict of interest arising from the fact that LINA both evaluated and paid benefits claims from Countrywide employees. First, although this Court discussed the requirements of 29 C.F.R. § 2520.104b-1(c) at length in the Prior M&O, Vaupel neither mentioned § 2520.104b-1(c) nor discussed its exacting requirements for furnishing materials electronically in his May 9, 2013, letter. Notably, Vaupel, who had e-mailed questions to in-house counsel on at least three separate occasions prior to denying plaintiff's appeal on July 31, 2009, apparently never consulted counsel before reaching his determination upon remand. Although he sent the attorneys an e-mail on April 24, 2013, that e-mail merely informed the lawyers of his determination and asked for comments

41

regarding his draft letter, which he characterized—in partisan tones—as "upholding our decision to deny the claim." LINA 523.

Second, Vaupel's determination that the 2003 and 2004 SPDs "clearly outline the Waiver of Premium benefit and the necessary filing provisions for making claims for benefits under the basic and voluntary life insurance plans," LINA 607, ignored portions of the Prior M&O which pointed out inconsistencies between the provisions of the 2004 SPD and the Policies. In support of his determination, Vaupel quoted a paragraph entitled "Waiver of Premium," LINA 606, and asserted that this paragraph was contained in the 2003 and 2004 SPDs "under the section 'Countrywide Basic and Voluntary Life Insurance Plans.'" Vaupel did not mention, however, that the paragraph was included only in the subsection entitled, "How the Voluntary Life Insurance Plan Works," and not in the section entitled, "How the Basic Life Insurance Plan Works"—a fact discussed at length in the Prior M&O.

The 2003 SPD, like the 2004 SPD which was discussed on page 11 and 12 of the Prior M&O, contained separate sections entitled, "How the Basic Life Insurance Plan Works," and "How the Voluntary Life Insurance Plan Works." *See* LINA 1356. The SPD also included a section entitled, "Life Insurance Plan Provisions," and a section including "Definitions." *Id.* The "Waiver of Premium" provisions were included only in the section of the SPD pertaining to the Voluntary Life Insurance Plan, LINA 1361-62, and not in the section relating to the Basic Life Insurance Plan or in the section containing "Life Insurance Plan Provisions." Moreover, while the "Overview" of the Voluntary Life Insurance Plan cautioned, "You must pay the required contributions in order for coverage to continue, unless you are disabled and meet the *Waiver of Premium* conditions," LINA 1359 (italics in original), the "Overview" of the Basic

Life Insurance Plan made no mention of the Waiver of Premium provisions.  Rather, it stated, in

pertinent part:

> Your Basic Life Insurance Coverage may continue if you are
> disabled as long as you provide the required proof of disability and
> you are younger than age 60 when your active service ends due to
> the disability. Contact Employee Benefit Services for more
> information on continuation of benefits while disabled.  LINA
> 1357.

To be sure, the "Waiver of Premium" section contained a reference to the Basic Life

Insurance Plan, but this reference did not cast doubt on the express provisions in the Overview

sections.  The "Waiver of Premium" section began:

> If you are under age 60 and your active service ends due to
> disability, your Basic and Voluntary Life Insurance coverage will
> continue until the earliest of the following dates:
>
> ✘ The date you are no longer disabled
>
> ✘ The day after the end of the period for which the required
> premiums are paid
>
> ✘ The date you no longer qualify for waiver of premium
>
> ✘ The day you turn age 65.  LINA 1361-62.

Nothing in this language or in the rest of the section alerted a participant to the facts that,

contrary to what was stated in the "Overview" section, a participant was required to file a Waiver

of Premium claim to continue Basic Life Insurance.  Indeed, a provision requiring a participant to

seek a Waiver of Premium with respect to the Basic Life Insurance Plan would have seemed

highly counter-intuitive, since employees in Active Service made no contributions to the Basic

Life Insurance Plan.  LINA 403.

Prior to *CIGNA Corp. v. Amara*, —U.S.—, 131 S.Ct. 1866 (2011), it was well-settled law in this Circuit that "[w]here the terms of a plan and the [summary plan description] conflict, the [summary plan description] controls." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 198 (2d Cir. 2007) (quoting *Burke v. Kodak Retirement Income Plan*, 336 F.3d 103, 110 (2d Cir. 2003) (alterations in *McCarthy*); *Tocker v. Philip Morris Companies, Inc.*, 470 F.3d 481, 487-88 (2d Cir. 2006) ("where the plan documents and the summary plan description conflict, the SPD controls."). While *Amara* may have overturned this well-established principle, *see Hamill v. Prudential Ins. Co. of America*, No. 11 CV 1464 SLT, 2012 WL 6757211, at *4, n. 7 (E.D.N.Y. Sept. 28, 2012), an SPD remains "an employee's primary source of information regarding employment benefits, and employees are entitled to rely on the descriptions contained in the summary." *Heidgerd*, 906 F.2d at 907. The description contained in the 2003 and 2004 SPDs would not have provided the Decedent with notice of the need to file a Waiver of Premium claim with respect to the Basic Life Insurance Plan, even if she had been furnished with a copy of those SPDs.

## *CONCLUSION*

In light of the foregoing, this Court holds that LINA's determination dated May 9, 2013, was arbitrary and capricious because it was both "unsupported by substantial evidence" and "erroneous as a matter of law." *See Durakovic*, 609 F.3d at 141. Accordingly, the Insurers' motion for summary judgment is denied, and plaintiff's motion is granted to the extent of remanding this matter to LINA for further proceedings consistent with this memorandum and order.

Although this remand is akin to a remand under "sentence four" of 42 U.S.C. § 405(g) remand, as opposed to a remand under "sentence six," *see Giraldo v. Building Service 32B-J Pension Fund*, 502 F.3d 200, 202 (2d Cir. 2007), this Court cannot enter judgment at this time because there are still outstanding claims involving the Bank. In light of the Second Circuit's opinion in *Thomas*, 581 Fed. App'x 39, which implies that Countrywide had delegated to LINA its duties as Plan Administrator, *id.* at 40-41, this Court is optimistic that the claims involving the Bank can be resolved without motion practice. If not, the Bank should request a premotion conference in accordance with the Court's Individual Motion Practices and Rules.

The Court declines to address plaintiff's motion for attorney's fees at this juncture. Plaintiff can renew that motion following the entry of judgment. *See* Fed. R. Civ. P. 54(d)(2)(B). In making that motion, plaintiff should not rely solely, or even primarily, on the five-factor analysis prescribed in *Chambless*, 815 F.2d 869, since that analysis is no longer required. *See Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 254-55 (2010) ("Because these five factors bear no obvious relation to § 1132(g)(1)'s text or to our fee-shifting jurisprudence, they are not required for channeling a court's discretion when awarding fees under this section."). However, this Court may still consider those five factors—including any "bad faith" exhibited during the pendency of this action—in deciding whether to award attorney's fees. *Id.*, at 255, n.8.

**SO ORDERED**.

/s/ Sandra L. Townes

SANDRA L. TOWNES
United States District Judge

Dated: March 2, 2015
Brooklyn, New York